ISRAEL v. CRESSWELL.
Patent Appeal No. 5394.

Court of Customs and Patent Appeals.
Feb. 10, 1948.

154

James P. Burns, of Washington, D. C., and Frederick L. Bissinger, of Cleveland, Ohio, for appellant.

Rudolph S. Bley, of Washington, D. C. (Richard K. Stevens, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority to the party Cresswell upon the single count involved, which reads as follows: "In the manufacture of viscose yarn wherein a vicsose solution is extruded through minute orifices of a spinneret into an acid precipitating bath to form filaments and the like therefrom, the step which comprises spinning the viscose filaments in the presence of a very small amount of a dissolved, substantially stable, surface-active polymerized ethylene oxide, whereby incrustation of the spinneret during the spinning operation is substantially inhibited."

The application of Cresswell, Serial No. 322,755, in which the count originated as claim No. 1, was filed March 7, 1940; that of Israel, Serial No. 348,325, July 29, 1940.

As the junior party, it was incumbent upon Israel to establish priority by a preponderance of the evidence. In his preliminary statement he alleged conception on or about September 23, 1937, beginning of diligence "in adapting and perfecting the invention," on or about June 17, 1938, and reduction to practice on or about September 24, 1939.

Cresswell alleged conception, the beginning of diligence and reduction to practice, all in October 1939, but no testimony was presented on his behalf and, therefore, he is restricted to his filing date of March 7, 1940, upon all questions of invention.

It appears that in the manufacture of rayon yarn a viscose solution is forced into an acid precipitating bath through extremely small orifices in a part called a spinneret (frequently referred to in the record here as a "jet") thus forming viscose filaments. In the bath the filaments coagulate and form strands which, in one operation referred to as "continuous spinning," are carried over rollers, or reels, to mechanism which finishes them into yarns. In another operation, referred to as "spool spinning,"

the moist strands are wound upon spools and further treated at a subsequent time—that is, it is not a continuous spinning process from the viscose solution to the finished yarn. A reduction to practice in either operation would meet the requirement of the count, the feature which lends patentability to the count being in the clause reading: " * * * the step which comprises spinning the viscose filaments in the presence of a very small amount of a dissolved, substantially stable, surface-active polymerized ethylene oxide, * * * "

The result of the step so defined is expressed in the final clause of the claim reading, "whereby incrustation of the spinneret during the spinning operation is substantially inhibited."

It is taught in both applications that in spinning rayon viscose the minute orifices in the spinnerets tend to become clogged by (1) the formation of "rings" within the orifices and (2) the formation of "craters," or cones, upon the surface of the spinnerets which have a tendency to spread over the orifices and close them, or otherwise interfere with the spinning operation. The substance which forms the rings and craters consists of very minute particles in the viscose solution that collect as the solution is forced through the orifices.

The examiner found that each of the parties to this controversy disclosed in his application that by using the oxide defined in the count the formation of the rings and craters which incrust the spinnerets and interrupt the spinning operation is substantially inhibited and, in conformity with the statute, declared the here involved interference to the end that it may be determined to whom a patent for the process shall be issued.

It may be said at this point that the testimony indicates that there is a difference in the effect of the described oxide on the rings which form within the orifices and the effect on the craters which form on the face of the spinneret. It appears that the specific oxide described in the count is more effective where used alone in inhibiting the rings than it is in inhibiting the craters. Indeed, the brief for appellant in discussing the question of diligence, which is hereinafter considered, alludes to

the utility of polymerized ethylene oxide as being "that of preventing formation of rings, i. e., deposits in the plane of the orifices in the spinneret, with some possible beneficial inhibition of crater formation on the face of the spinneret," and we, in fact, deduce from the testimony that in order effectively to inhibit (that is "to check, to hinder, to restrain") the formation of craters another material, referred to as "Daxad 11," was combined with the described oxide.

No collateral questions are involved in the controversy and the ultimate issues are issues of fact. Upon certain of the factual matters appellee made concessions before the board and repeats them before us which tend, as appellee in the brief states was the purpose, "to facilitate consideration of the proofs and to make the essentials readily apparent." The concessions so referred to are stated in the brief before us as follows: "Appellee here, as below, admits prior conception by appellant. Appellee admits that Carbowax 4000, Lubricant 4000, Polyalkylene Oxide 4000 and Agent H, as referred to in this record, all designate the same substance and that this substance is a polymerized ethylene oxide. Appellee admits that appellant's assignee, Industrial Rayon Corporation, had available sufficient quantities of polymerized ethylene oxide capable of use in the alleged tests of September and November 1939."

■ Priority of conception having been conceded to him, appellant's burden was limited to establishing actual reduction to practice prior to appellee's filing date of March 7, 1940, or, failing that, establishing reasonable diligence from a time just prior to appellee's filing date up to his own filing date of July 29, 1940.

It is deemed proper to make reference to certain allegations in the brief on behalf of appellant before discussing the testimony and other evidence bearing directly upon the questions of fact.

■■ One allegation is that the board required appellant "to prove his case beyond a reasonable doubt and not merely by a preponderance of the evidence." No such requirement was expressed nor do we find it implied in the board's decision. It was

essential under the law that there should be corroboration of the testimony of the party Israel upon various matters involved in the alleged reduction to practice and the board held such evidence as was presented upon certain of those matters insufficient to be regarded as corroborative. So far as we can discern, the board did not go beyond the "preponderance of evidence rule" applicable in such cases.

Another allegation reads: "1. The Board of Interference Examiners erred in its failure to construe the count as broadly as its language requires and in its failure to evaluate the Israel proofs in the light of a proper interpretation of the count."

In support of such allegation it is asserted, in effect, that the decision of the board (1) erroneously construed the whereby clause of the claim, and (2) attached greater importance to it "than to the recitation of the invention."

There is considerable argument relative to the meaning of the phrase "substantially inhibited" and we suppose it was intended to imply that the board construed the phrase as requiring that a greater amount of incrustation be inhibited than a proper understanding of the meaning of the phrase requires. We do not think the board did so. Appellant's brief fails to specify any expression in the decision which indicates that the count was given any interpretation inconsistent with the normal meaning of its phraseology. Furthermore, we do not find in the decision justification for the claim that the board attached greater significance to the whereby clause of the count than to the step which renders the claim patentable, or, as appellant phrased it, "to the recitation of the invention."

In this case, as is presumed to be true in all cases in which the claims have a whereby clause, the clause states the result. The result, of course, is not patentable and when stated it adds nothing to the patentability of a claim. It does not detract from a claim, however, to express the result in proper phraseology and it is not objectionable. It is essential to show utility in order to obtain a patent and even when utility is asserted in a claim it is not to be taken for granted if challenged or doubted, and certainly in an interference proceeding such as this it is not improper in determining the question of reduction to practice to consider whether or not a defined result was obtained from the step or steps outlined in the count. It is a factor which may be looked to along with all the other evidence in the case as an aid in determining whether a process was in fact carried out. If, for example, it had developed that following the use of the defined oxide in the tests alleged to have been made in this case, there was no substantial inhibition of incrustation we think it would be most logical to conclude either that no tests in fact had been made, or, if any were made, that they were not of a character which would constitute reduction to practice. Therefore, it was entirely proper for the board to look to the evidence concerning results, and we do not find where it attached undue importance to the whereby clause. The board was not considering, nor are we considering, the question of patentability. That was determined by the examiner in the Patent Office before the interference was declared. "Inhibition" does not mean "prohibition," of course, and the board did not so hold.

The foregoing disposes of appellant's reasons of appeal numbered 14 and 15. Reasons 1 to 5, inclusive, relate to diligence and reasons 6 to 13, inclusive, to reduction to practice. The latter will be first considered. It, like the former, is purely a question of fact.

It is obvious from the board's decision that it carefully scrutinized and weighed the testimony and all other evidence bearing upon the matter of reduction to practice, and it should be understood that we consider the case under the age old rule applicable in proceedings of a judicial character such as this proceeding is, viz., that an appellate tribunal will not reverse the findings of fact made by the trial tribunal from which the appeal is taken unless such findings be clearly against the weight of the evidence.

In the instant case the burden rested upon appellant to establish certain factual matters affirmatively by a preponderance of the evidence. The board's finding

was negative—that is, it found that affirmative evidence to establish necessary facts had not been produced. It was not a matter of conflicting testimony in which it was necessary to pass upon the credibility of witnesses. Its finding was to the effect that there is an absence of evidence covering material points.

Appellant claims to have reduced the invention to practice in the continuous spinning operation during the period from September 24, 1939 through October 16, 1939, and in the spool spinning operation during the period from November 3, 1939, through December 14, 1939. Both these operations are hereinbefore described.

The tests made during those periods are the only ones concerning which any evidence was introduced.

The party Israel testified at length in his own behalf and sustained himself quite well under a very rigid cross-examination. The board did not question his veracity, nor did it analyze his testimony in detail in its decision, because it evidently found a failure of corroboration of it upon material points. So, in effect, it held that, however complete Israel's testimony was, he could not, under the law, prevail in an interference proceeding upon the basis of his own uncorroborated statements. This ruling is in strict conformity with the practice which has been followed in interference proceedings from time immemorial.

In many of the interference cases which have come before this court during the last few years those representing the parties upon whom the burden of proof rested have complained that the rule is a harsh one which should be modified. Now and then it has been suggested that application of the rule carried with it a reflection upon the veracity of one claiming to be an inventor. It is true that the requirement of corroboration probably removes a temptation which would otherwise exist, but it has never been our supposition that the underlying reason for the rule is lack of faith in the credence of those who seek the benefits of the patent laws. It has been our theory that it is based upon the recognized necessity of so guarding the integrity of the patent system that there will be as little

doubt as possible that the actual inventor receives the award. Surely every question bearing upon this should, so far as possible, be settled by appropriate action before a patent issues. It is not infrequently complained that the enforcement of the rule works a hardship upon inventors. There are many laws which are recognized as sound and necessary the enforcement of which, in some instances, work hardships. We can discern no good reason why the rule of corroboration in patent jurisprudence should do so, particularly since it is a rule of such long standing and one so universally known. In laboratories such as that of Industrial Rayon Corporation (the owner by assignment of the application here involved) which employed appellant, it should not have been a difficult task to reduce the invention to practice in the presence of competent chemists in the employ of the corporation who could have identified every requisite step that was taken.

Appellant not only knew the problem involved; he is conceded by his antagonist to have conceived a solution of the problem, and this conception was prior to any date claimed by appellee. He had only to perform the final inventive act—that of reduction to practice—and in September 1939 he had within the plant of his assignee and under his control the particular material for use in performing that final act.

In view of some of the immediately preceding observations we feel it should be said that counsel for appellant in this case made no contention before us that the rule of corroboration should be disregarded or even modified, but to sustain the contentions actually made, we should have to supply by inference material matter not actually appearing in the testimony of the witnesses called to corroborate the testimony of appellant.

The board definitely and clearly pointed out the omissions, and we cannot properly reverse its finding of fact relative to reduction to practice because that finding is not against the weight of the evidence. On the contrary, it is, in our opinion, in conformity with the weight of the evidence, as "weight of the evidence" is commonly

understood and applied, because of appellant's failure to meet the burden imposed by law upon him.

Inasmuch as we are not in disagreement with the board's findings upon this phase of the case, it could add nothing to the interest of the parties or to the public good to set out a discussion which at most would be nothing more than a paraphrase of the board's findings, or a statement of same in different phraseology. We, therefore, refrain from so doing.

This disposes of the subject matter covered by reasons of appeal 6 to 13, inclusive, and we turn to the question of diligence.

 The record does not disclose to what extent the matter of diligence was pressed before the board, but the only references made to it in the board's decision are found in two brief paragraphs, the first near the beginning of the opinion and the second near its end. In the first it was said: "* * * the latter [diligence] question may be resolved at once by noting that there is no evidence of any activity whatever by Israel during this period [i. e. from just prior to March 7, 1940, Cresswell's filing date, to July 29, 1940, appellant's filing date], hence the possibility of Israel prevailing on the basis of early conception coupled with diligence is ruled out * * *."

The second reference reads: "Although Cresswell has conceded that Israel has established conception of the invention of the count prior to Cresswell's filing date, this fact is of no consequence here inasmuch as we have failed to find a record of any activity on which diligence could be based."

The matter of diligence has been pressed before us quite earnestly and in view of the fact that the board did not discuss the evidence upon which appellant relies to support it, we have considered it virtually de novo.

The brief for appellant states the following premise (the italics being quoted): "Bearing in mind that the field of utility of polymerized ethylene oxide (Carbowax) in the spin bath is that of preventing formation of rings, i. e., deposits in the plane of the orifices in the spinneret, with some possible beneficial inhibition of crater forma-

tion on the face of the spinneret; additionally bearing in mind that *the count is generic*, merely requiring the spinning of the viscose filaments in the presence of polymerized ethylene oxide *without negativing the presence of supplemental or augmenting spin bath agents;* and further bearing in mind that the result required to be achieved by the use of polymerized ethylene oxide in the spin bath is only *substantial inhibition* of spinneret incrustation; let us look to the facts of this case bearing on diligence."

Before taking up the evidence upon which appellant relies, an analysis of the foregoing premise, particularly its first clause, is proper. While it is true that the use of polymerized ethylene oxide must be presumed here to have utility in inhibiting the formation of rings, etc., there is no proof whatever in the record that such inhibition is its sole function, even when used in the spin bath, and even if that be assumed to be its sole function when used there, it cannot very well be assumed that it is not used elsewhere in the rayon spinning art, or about the plant independently of the art itself. The importance of this will appear hereinafter.

The meaning of the second clause, as we understand it, is that it is not requisite, in order to meet the count, that polymerized ethylene oxide alone should have been used as an inhibiting agent but that the count was met by using it in combination with another substance. As hereinafter appears, the facts shown in this case do not necessitate a ruling as to whether it had to be used alone in order to meet the count and we refrain from passing upon that question until some case comes before us which does necessitate it.

So far as the third clause is concerned, we think sufficient has been said hereinbefore as to the meaning of "inhibition" and "substantial." Appellant's theory in that regard is approved by us, as it was, in our opinion, by the board.

The first matter cited in appellant's brief as being relied upon relative to diligence is the sending of a teletype message (a copy of which was placed in evidence as Israel Exhibit 16) by an official of Industrial Ray-

on Corporation at Cleveland, Ohio, to an official in its plant at Painesville, Ohio, under date of January 9, 1940 (about two months before the filing date of appellee's application), and the acts following it. The teletype message (unnecessary capital letters being changed to small letters) reads:

"Mr. Israel will arrange to be in Painesville tomorrow to start the use of Lub 4000 and Daxad 11 in the experimental spin bath system.

"The proper preparations will be made while rayon machinery is installing the larger eccentricity No. 1 reels."

Israel testified that he did go to Painesville and on direct examination gave further testimony as follows:

"Q. 184. Was Lubricant 4000 thereafter actually used in the commercial operations of the Painesville plant? A. It was.

"Q. 185. I notice in this communication a reference to Daxed 11. Was that a further addition agent that was also used? A. Yes; that was another constituent of the spinning bath at the Painesville plant.

"Q. 186. Did the incorporation of that constituent in any way hinder the action of Lubricant 4000 that was added? A. No."

The witness was not questioned vey much in either his direct or cross-examination as to what he personally did at the Painesville plant. The following substantially covers what he said about that matter on cross-examination.

"X-Q. 434. You referred to a teletype in January, 1940, which referred to the use of Lubricant 4000 in the experimental [the teletype, supra, refers to "experimental spin bath"] plant there [at Painesville, Ohio]; is that right? A. That is right.

"X-Q. 435. What was the occasion of using it first in the experimental plant rather than immediately proceeding to use it on strictly a commercial basis?

"A. There are problems that sometimes arise when you go from a pilot plant experiment to a large plant that are not so obvious in the operation of a pilot plant, so that it is general practice, I think, not only with us, but in any organization, it would be common sense, to go from your small pilot plant into a semi-commercial unit, and all the while checking any difficulties encountered, and from that into the plant scale setup.

"Accordingly, we started with a 50 end unit. Then we went to a 200 end unit in Painesville, from the 200 end unit I think we went to two 200 end units, and from that we went into the main plant with it.

"X-Q. 436. You actually commenced the use of Lubricant 4000 and Daxad 11 at your Painesville plant around March 1, 1940, did you not? A. That is the best of my recollection, yes.

"X-Q. 437. And you had already theretofore commenced the use of this combination in the Cleveland plant, had you not, in commercial operation? A. Yes, I believe that was some time in January.

"X-Q. 438. But you still felt it necessary, in order to make this transition, to first use it in the experimental plant, I assume, for [from] some time in January until its adaptation some time around the middle of March, 1940? A. Simply to iron out any unusal problems that might come from larger scale operation."

It should be said that the board in considering the question of reduction to practice failed to find any satisfactory evidence that appellant's assignee used the oxide for the purposes stated in the count in its manufacturing operation (that is used it on a commercial scale) at any of its plants prior to appellee's filing date. If the record contained such evidence the conclusion upon the question of reduction to practice would be different, and there would be no occasion to consider the matter of diligence.

In view of the claim in appellant's brief, in connection with his discussion of the question of diligence, to the effect that the patentable step of the count had been adopted commercially in both the Cleveland, Ohio, and Painesville, Ohio, plants of appellant's assignee before appellee filed his application on March 7, 1940, we quote from the testimony of Israel given during his cross-examination on that point:

"X-Q. 288. Can you tell us approximately when it was that Lubricant 4000 was adopted commercially in all three plants?

A. Our plant records would certainly show the exact dates, but if you want the approximate dates, I think I can give them to you from memory.

"X-Q. 289. Will you do so please? A. Some time in early January, as I recall, we bought the material and put the process into use in the Cleveland plant. I believe it was about the 1st of March in the Painesville plant, and about the same time, or approximately a little earlier, in the Covington plant. It was in 1940 in the case of the Covington plant. I am not as sure of that as I am of the other two. I can go only by my memory. It has been some time ago. If you wish to get the exact figures, I think our records will show them."

It is pointed out in the brief for appellee that no records were produced, notwithstanding Israel's uncertainty as to dates, upon this quite important phase of the case.

We do not regard the evidence relative to what took place at the Painesville plant as being sufficiently definite to be of aid to appellant on the question of diligence. It is clear from his own testimony that whatever experiments were carried on at that plant were performed with use of lubricant 4000 (the oxide of the count) and Daxad 11 in combination. If it be assumed (and we do not make such assumption) that the critical step of the count would be satisfied by the use of lubricant 4000 in combination with Daxad 11 rather than alone, it remains true that the evidence upon the use of the combination is so indefinite and uncertain that it cannot properly be considered as constituting a part of diligence.

A second matter which counsel for appellant cites as bearing upon the question of diligence is that, on February 13, 1940, a district sales manager of Carbide and Carbon Chemicals Corporation, the manufacturers of carbowax (the oxide of the count) supplied appellant's assignee with sheets containing reading matter relating to the nature, use, etc., of the substance. A copy of the matter so supplied was introduced in evidence together with a copy of the letter transmitting it as Israel Exhibit 14. It is emphasized in the brief that it was supplied at the request of appellant's assignee, Industrial Rayon Corporation.

We presume the reason for the emphasis is that the request tends to indicate that appellant, or his assignee, was interested in the substance and that its inquiry was a part of the diligence claimed. This seems to us to be somewhat far-fetched, particularly in view of the claimed knowledge by various of the assignee's employees, concerning the substance and the experiments conducted with it months prior to February 1940. We have examined Exhibit 14 and find nothing therein which of itself seems to have any bearing upon the matter of appellant's diligence.

The third matter urged as bearing upon the question of appellant's diligence is stated in the brief on his behalf as follows: "Israel Exhibit 18 is a summary report of experimental work done in October, November and December 1939. This report is dated *March 26, 1940*. It is signed and was corroborated by the witness MacLaurin and it shows on its face that copies were sent to Mr. H. B. Kline, Mr. L. S. Fryer, Vice Presidents of Industrial Rayon Corporation, and to Mr. C. E. Herrstrom, who the record shows at that time was patent counsel for Industrial Rayon. The submission of this summary report and the turning of the same over to patent counsel also occurred in the critical period between March 7, 1940 (Creswell's filing date) and July 29, 1940 (Israel's filing date)." (Italics quoted.)

It will be observed that the document, while itself dated March 26, 1940, is said to summarize experimental activities of Israel and some of the other employees of Industrial Rayon Corporation the months of October, November and December 1939. Those activities (which apparently were experiments carried on with respect to the spool spinning operation hereinbefore explained) were relied upon to support appellant's claim of reduction to practice, but having occurred some three months or more prior to the period which is critical in the matter of diligence, we do not understand that they are relied upon in respect to that. As we understand it, there is no claim that the subject matter reported affects the question of diligence, but it is claimed that the act of reporting it, which act occurred during the critical period, is some evidence of

diligence. The report was signed by R. D. MacLaurin, who is, or was during 1938, 1939, and 1940, in charge of the research laboratory of appellant's assignee in which appellant worked. It is not discerned how the sending of copies of the report to the vice presidents, Kline and Fryer, of appellant's assignee, bears upon the matter of diligence. The sending of a copy to the patent attorney, Herrstrom, might have some bearing if there had been a showing as to why it was sent him. If he had been instructed on March 26, 1940, to proceed with the preparation of an application such as that which was filed July 29, 1940, and which became involved in this interference, it might be entitled to some weight, although this is doubtful in view of the paucity of the testimony relative to acts which occurred prior to appellee's filing date.

However this may be, there is no showing that any such instructions were given the attorney. The only matter in the report which refers to a patent application is the concluding paragraph of its last section (Israel's Exhibit 18-H) reading: "In conclusion it is recommended that experiments also be made using the glycol as Lub.1500 (mol. wt.), Lub.1500 high melting (ave. mol. wt. about 2000), and Lub. 420 (Nonaethylene glycol). This seems important if done solely to obtain information for use in a patent application."

Obviously appellant derives no aid from Exhibit 18 on the question of diligence.

The remaining matter upon which reliance is placed to establish diligence for appellant is the purchase during the critical period—that is, from shortly before March 7, 1940, to July 29, 1940—of large quantities of polymerized ethylene oxide (sold at different times under different trade names) by appellant's assignee from the maker thereof, Carbide and Carbon Chemicals Corporation. The first order listed in appellant's brief was dated March 1, 1940. It was for 6500 pounds, 2000 pounds of which were to be shipped express on March 7, 1940. Nineteen additional purchase orders are listed, the last being for 6400 pounds ordered July 8, 1940, and stated to have been shipped August 1, 1940.

The brief for appellant summarizes the quantity purchased for the three plants of appellant's assignee during the critical period as being 68,600 pounds. The prices paid for it ranged from 30 cents to 35 cents per pound, the total amount paid being $22,000. That it was received by appellant's assignee is not questioned. The quantity was substantial and the amount paid for it was substantial. It would be interesting to know what appellant's assignee did with it, but the record does not tell us. At least, counsel for appellant has not pointed out where it is shown, nor have we found it by much research.

Counsel for appellant in argument implies that it was used for substantially inhibiting the incrustation of spinnerets used in spinning rayon yarn, and seeks to have us so hold. The trouble about so holding is that courts in deciding legal controversies are not at liberty to supply a missing fact by use of the imagination, and if we should do this here appellee would have just ground for complaint. Surely it was within the power of assignee to prove what the material was used for. If this could not have been done by an examination of persons in the plants who used it or saw it used, it would seem that appellant might at least have shown by the representative of the seller (who was called as a witness for appellant and examined at length) that it was not suitable for any use other than that named in the count, provided, of course, such was the case. As a matter of fact, Exhibit 14, which has been referred to hereinbefore, and which is in the nature of advertising matter, indicates that it has a variety of uses. It is noted, for example, that the concluding paragraph of the exhibit states: "As yet, there is insufficient knowledge concerning the physiological effects to state whether these waxes can be taken internally. Animal studies, conducted to date, indicate they are harmless for external application."

In the absence of any showing that the substance purchased by appellant's assignee was used in carrying out the critical step of the count, the evidence of its purchase and delivery is of no aid to appellant on the matter of diligence.

Counsel for appellant apparently has sought to construct from the record a chain of facts and circumstances from which

diligence may be ascribed to appellant. The old expression to the effect that no chain is stronger than its weakest link is apropos here—in fact, here there is a fatal weakness in each of the links used in the effort to form the chain.

The concluding section of the brief for appellant is directed to an argument to the effect that the decision of the board is replete with errors and is not in harmony with the decisions of this court.

We have given respectful consideration to the argument and have considered the cases cited. It seems not amiss to reiterate that only questions of fact are involved here. So far as the interpretation of the count is concerned, we agree with that of counsel for appellant and, so far as we can discern, there was no disagreement by the board or by counsel for appellee upon that phase of the controversy. When questions of fact only are involved one does not often find aid in decisions of other cases where the situation is the same, because in such instances each case must be considered upon its own record. It is rare indeed to find two cases which are in all respects alike.

For the reasons hereinbefore stated, the decision of the Board of Interference Examiners is affirmed.

Affirmed.