**STIMSONITE CORPORATION, Plaintiff,**

v.

**NIGHTLINE MARKERS, INC., et al., Defendants.**

**No. 98 C 2460.**

United States District Court, N.D. Illinois, Eastern Division.

Jan. 19, 1999.

---

Ronald A. Sandler and Sandra B. Weiss of Jones, Day, Reavis & Pogue, Chicago, IL, for Plaintiff.

Richard A. Vitek and George D. Moustakas of Harness, Dickey & Pierce, P.L.C., Troy, MI, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Stimsonite Corporation ("Stimsonite") asserts that NightLine Markers, Inc. ("NightLine"), Harry Lowe ("Lowe") and Charles O. Hiler & Son, Inc. (collectively "NightLine," treated as a singular noun) have infringed Stimsonite's U.S. Patent No. 5,277,513 (" '513 Patent") for snowplowable reflective highway pavement markers.[1] Stimsonite asks for injunctive relief, damages and an award of attorneys' fees and costs. NightLine has counterclaimed for (1) a declaratory judgment of its noninfringement or of the invalidity of the '513 Patent and (2) an award of "its interests, costs and expenses" (whatever that may mean).

Stimsonite and NightLine have now filed cross-motions for summary judgment that address only the infringement issue.[2] Each side has complied with this District Court's General Rules ("GR") 12(M) and 12(N),[3] which have been adopted to highlight the existence or nonexistence of any material factual disputes. Both motions are fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, NightLine's motion for summary judg-

---

1. There is some irony in the fact that during much of the period when this opinion was in the works the Chicago area has been battered by a succession of heavy snowstorms—including one blizzard when this Court, inching its way along what it hoped (but could not be sure because of the blinding snowstorm) was Highway I–94, would have been delighted to find its way assisted by either litigant's product.

2. This Court recognizes that the Federal Circuit prefers lower courts to address both infringement and validity in the same proceeding (see *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1582–83 (Fed.Cir.1983)), and its own regular practice has been to honor that prefer-

ence. But because the parties here have opted to limit their summary judgment motions to infringement (*Medtronic, id.* at 1583 (emphasis added) says "The better practice is to decide both issues *when both are presented at trial*"), this Court has not been given any opportunity to decide the validity issue.

3. This opinion refers to Stimsonite's GR 12(M) statement as "S. 12(M) ¶ —" and to NightLine's GR 12(M) statement as "N. 12(M) ¶ —." Those same letter abbreviations ("S." and "N.") are used to refer to the parties' other submissions as well.

ment is granted, while Stimsonite's motion is denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)). Where cross-motions for summary judgment are involved, it is thus necessary to adopt a dual perspective that sometimes forces the denial of both motions. Fortunately that is not the result here.

### Facts

Stimsonite has been developing and selling snowplowable reflective highway pavement markers for more than three decades. Those products are installed in highways to demarcate both the lines between lanes of traffic and the outer edges of the highways by reflecting light from automobile headlights to make the lanes and highway edges more visible at night. Such markers necessarily rise slightly above the surface of the highway to catch and reflect the light from the headlights. But that requirement causes problems in colder climates, where snowplows often have to remove snow from roadways. To be "snowplowable," such markers must be capable of withstanding the impact of a snowplow blade without being dislodged from the pavement.

Furthermore, snowplowable markers must be able to handle snowplow blades that strike them at an angle. As a practical matter snowplows do not simply move snow straight ahead—instead the plow blades are angled to push the snow to one side of the road. In 1980 Stimsonite obtained U.S. Patent No.

4,195,945 (" '945 Patent") [4] for a snowplowable marker that could handle plow blade angles of roughly 30° ('945 Patent col. 2 line 17). It manufactured its model 96 and 96LP markers under that now-expired patent.

But in recent years highway snowplows have been operating at higher speeds and with the use of greater blade angles. With that in mind, in the early 1990s Stimsonite developed a marker that could accommodate a snowplow blade angle of 50°—an asserted improvement over its prior products. In 1994 Stimsonite patented its new device, and that is the '513 Patent [5] at issue in this case.

Snowplowable markers typically comprise a plastic reflector mounted on an iron base. That base includes two ramps set side by side, with a reflector perpendicularly mounted between and below those ramps, thus creating a roughly "H" shape (viewed from above). That construction is designed to enable the snowplow blades to ride up and over the ramps without hitting the plastic reflector. Both the '945 and '513 Patents cover inventions whose ramps allow snowplowing in either direction. Stimsonite's '513 Patent describes a longer, narrower product than the prior art described in the expired '945 Patent, assertedly because that difference in dimensions allows the new invention to accommodate the greater plow blade angles.

Lowe is a former Stimsonite employee who now owns and is the only employee of NightLine (N. 12(M) ¶ 8). In recent years Lowe has attempted—both successfully and unsuccessfully—to introduce snowplowable markers into the market to compete with Stimsonite's products. For example, Lowe successfully manufactures the NightLine A250 marker, which is very similar to Stimsonite's products under the now-expired '945 Patent (S.12(M) ¶ 90). Lowe has previously failed, however, in his efforts to market another marker—the NightLine 250 marker—because Stimsonite sued him for infringement of the '513 Patent, to which Lowe re-

---

**4.** S. Ex. 11, an illustrative drawing from which has been excerpted as Ex. 1 to this opinion, reproduces the '945 Patent.

**5.** S. Ex. 1, an illustrative drawing from which has been excerpted as Ex. 2 to this opinion, reproduces the '513 Patent.

sponded by agreeing to stop making the 250 marker (S.12(M) ¶¶ 88–89).[6]

Lowe renewed his efforts to compete with Stimsonite's new markers by designing the NightLine B250 and B350 markers, the accused products in this case, and by advertising them as competitive with the Stimsonite 101 and 101LP markers, which practice the '513 Patent's art (S.12(M) ¶¶ 92–93).[7] Stimsonite employees saw NightLine's new markers at a June 1997 trade show, after which Lowe gave Stimsonite his detailed drawings in an effort to demonstrate that no infringement was involved. Stimsonite was not satisfied, and it filed this infringement suit 10 months later.

## Infringement

Patent owners have a monopoly on their inventions during the term of their patents. But as the seminal opinion in *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185, 16 S.Ct. 1002, 41 L.Ed. 118 (1896) teaches:

It is self-evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent.[8]

6. Though Stimsonite seeks to pillory Lowe as a commercial parasite (more on this subject a bit later—see. n. 8), it appears that when Lowe first entered the field with the NightLine 250, Stimsonite had not marked its most recent product with any designation referring to the then-newly-issued '513 Patent. Thus Lowe reasonably believed that he was producing a product that competed with the most recent incarnation of Stimsonite's *expired* '945 Patent—something that he had a perfect right to do. When Stimsonite then brought the new patent to his attention, he promptly desisted.

7. Ex. 3, which depicts the B250 marker, is taken from a NightLine sales brochure (S.Ex. 6). Exs. 1 to 3 have been placed on the same page to assist in following the discussion here, although the absence of the critical measurements on the drawings prevents any precise analysis from the

Thus our American patent system serves two equally important goals: to secure the patentee's rights (the definitional goal) and to put others on notice of what the patentee has removed from the public domain for the life of the patent (the notice goal) (*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373, 116 S.Ct. 1384, 134. L.Ed.2d 577 (1996), quoting *McClain v. Ortmayer*, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800 (1891)).

To fulfill those dual functions, patent documents include both a claim and a specification. According to 35 U.S.C. § 112 [9] "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art...to make and use the same." On the other hand, the claim must "particularly point [ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention" (*id.*). Indeed, the claim language is at the core of the interpretive process (*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998)).

Stimsonite contends that NightLine has infringed the '513 Patent as defined by its claim and specification. Infringement occurs if a person makes, uses, offers to sell or sells a patented invention within the United States during the term of the patent (Section 271(a)). At issue here is whether the product made by NightLine encroaches on the newer Stimsonite patent, an infringement analysis that involves two steps. First, the

depictions themselves. To assist this Court in the analysis, the parties have complied with its request to deliver the products themselves to its chambers.

8. [Footnote by this Court] Stimsonite urges in a pejorative tone that Lowe "bided his time for *nine years* " (S. Mem. 2, emphasis in original) waiting for the '945 Patent to expire so that he could then manufacture a similar product. But it has been more than a century since *Singer* made it crystal-clear not only that Lowe has that absolute right under the patent law, but also that such right to compete after a patent's expiration is the price that must be paid by the patentee for the limited-term (though long-term) monopoly conferred by that law.

9. All further statutory references · will take the form "Section —," using the Title 35 numbering.

court must determine as a matter of law the meaning and scope of each patent claim at issue (*Markman*, 517 U.S. at 387–91, 116 S.Ct. 1384). Second, the properly construed claim is compared to the accused device to determine whether the claim limitations were met either literally or by a substantial equivalent (*Renishaw*, 158 F.3d at 1247–48).

*Claim Interpretation*

■ At the outset of the interpretive process, a court must first consider the intrinsic evidence: the claim, the specification (also called the written description) and the prosecution history (*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996)). If one of ordinary skill in the art can interpret that evidence unambiguously, the court should look no further (*id.* at 1583). Only if the intrinsic evidence is ambiguous as to the breadth or meaning of the claim may the court properly consider extrinsic evidence, such as expert testimony (*Bell & Howell Document Management Prods. Co. v. Altek Systems*, 132 F.3d 701, 705–06 (Fed. Cir.1997)). That general exclusion of extrinsic evidence reflects the notice (and reasonable reliance) function of patent law. Because the public must look solely to—and is entitled to rely on—the words of the patent, specification and prosecution history to learn what has been removed from the public domain, courts should do the same (*Vitronics*, 90 F.3d at 1583).

Because claim interpretation thus begins with intrinsic evidence, the Federal Circuit has erected two pillars of claim construction that focus on the relationship between the claim and the specification (*Renishaw*, 158 F.3d at 1248):

(a) one may not read a limitation into a claim from the written description, but (b) one may look to the written description to define a term already in a claim limitation, for a claim must be read in view of the specification of which it is a part.

More generally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will ·be, in the end, the correct construction" (*id.* at 1250).

For purposes of the current Rule 56 motions, the parties contest the interpretation of only one element of one claim in the '513 Patent.[10] That disputed element of Claim 20 reads:

> ... said ramp members being separated by a distance of substantially about 3.5 inches from inside to inside whereby said base member can accommodate the movement thereover of a snowplow blade straddling the ramps and disposed at an angle not in excess of 50˝ measured perpendicularly to the longitudinal axis of the base member before any part of the plow blade may impact an associated reflector mounted on the base member.

NightLine argues that the measurement of "substantially about 3.5 inches" refers to the distance between the ramps at their distal ends, where they begin to rise above the road surface. Stimsonite, on the other hand, maintains that the measurement refers to a point considerably higher up the ramps, at or near the reflector entrance.[11]

As an examination of the claim language demonstrates and as the parties' disagreement further confirms (though the fact of such disagreement does not necessarily betoken ambiguity), the claim element at issue is ambiguous: Where is the "inside to inside" measurement to be taken? Because the inside edges of the ramp members of the '513 Patent (and therefore the Stimsonite 101 and 101LP markers) are shown as parallel ('513 Patent Fig. 2, Ex. 2 to this opinion), they measure 3.54 inches apart at every point. But the inside edges of NightLine's accused markers measure roughly 3.75 inches at the reflector entrance and stay parallel for a short distance down the ramps, then taper out to a little more than 4 inches at the distal ends of the ramps (S.12(M) ¶ 94, N. ·12(M) ¶¶ 29–30, 35, Ex. 3 to this opinion). This Court must determine, then, at what point

---

10. For present purposes NightLine has admitted that the other claims in the '513 Patent read on its accused device (S.Ex. 15, 16).

11. Although neither the parties nor the patent documents give a precise definition of the term "reflector entrance," this Court will use the term to refer to a point immediately before the recessed reflector support surface.

along the ramps Stimsonite's '513 Patent claims the approximate 3.5 inch distance as an essential element. Keeping in mind the canons of claim construction set out by the Federal Circuit, this Court turns to the written description and the prosecution history for help.

Stimsonite's written description is an appropriate resource for use in clarifying the ambiguous claim reference. That written description discusses the 3.5 inch measurement several times. Each of those times the measurement is mentioned in comparison to a 4.9 inch measurement drawn from the prior art as embodied in the Stimsonite 96 and 96LP. Although the references are somewhat lengthy, their virtually dispositive influence on the interpretation of Claim 20 suggests it is appropriate to recite two critical references here: [12]

1. At '513 Patent col. 3 lines 42–48:

It is another feature of the present invention that the distance between the inside edges of the inclined ramps is reduced to lower the chance of plowblade contact with the reflector during snowplowing. Preferably, this distance is reduced from about 4.9 inches in the prior Model 96 and 96LP versions, to approximately 3.54 inches, allowing for increased plow blade angle.

2. At '513 Patent col. 4 lines 63–68:

The base member has two inclined upper ramp surfaces, the inside edges of which are laterally spaced apart a distance of about 3.54 inches (compared with the 4.9 inch spacing of the prior "96" and "96LP" markers) to reduce the probability of plowblade contact with the retroreflector carried by the base member.

In both of those descriptions the drafter distinguishes the '513 Patent's 3.54 inch spacing between the ramps from the prior art's 4.9 inch spacing, then explains that such a reduction enables the marker to accommodate a greater blade angle and to provide better protection for the reflector. Likewise, the language in Claim 20 connects the 3.5 inch spacing with the larger 50° blade angle and greater reflector protection. To one skilled in the art of snowplowable highway markers, it would be reasonable to assume that the claim reflects the specification language and therefore refers to the area on the new marker that has been reduced from 4.9 inches. Furthermore, "explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim" and "can lead to narrow claim interpretations" (*Spectrum Int'l, Inc. v. Sterilite Corp.,* 1998 WL 854715, at *5 (Fed.Cir. Dec. 9, 1998)). Because Stimsonite repeatedly distinguished the dimensions of its own prior art in order to obtain its new patent, it must be held to its statements.

Thus this opinion must turn to the prior art, as taught in the '945 Patent, to determine where the 4.9 inch spacing is found. Stimsonite's 96 marker (see Ex. 1 to this opinion) has ramps that are roughly 4 inches apart (inside to inside) at the reflector entrance, then taper outward to approximately 4.9 inches and remain a constant 4.9 inches apart for roughly an inch at the ends of the ramps.[13] Accordingly, Stimsonite in its '513 Patent, when it compares the invention's 3.54 inch distance with the prior art's 4.9 inch distance, must be referring either to the distal end of the ramps (as NightLine would have it) or, at best from Stimsonite's point of view, to the last inch or so of the ramps in order to gain a new extended monopoly.[14]

---

**12.** In other places in addition to those excerpted here, the specification more generally refers to "narrower ramp spacing" (see, e.g., '513 Patent col. 4 line 16). It also compares the distance between the keel members in the prior art (4.9 inches) with that in the new invention (3.54 inches) ('513 Patent col. 6 lines 39–45 and col. 8 line 67 to col. 9 line 8). However, those other references are not directly relevant to the claim construction, because Claim 20 refers to the ramps and not the keels. In the prior art, at some points the keels and the ramps have different distances between them.

**13.** Stimsonite's 96LP has ramps that measure 3.75 inches apart at the reflector entrance, then taper out to a constant 4.68 inches apart for close to 1–1/2 inches at the ends of the ramps. That slight difference has little or no effect on the issues at hand.

**14.** Even the inventor of the '513 Patent product, Robert Flanagan, agreed in his deposition that the specification referred to the distance between the ramps at or near their ends, rather than at the reflector entrance (S. Ex. 19 at 74–76).

That reading is further buttressed by the '513 Patent's prosecution history, another proper interpretive source (see *Vitronics,* 90 F.3d at 1582–83). When Stimsonite applied for a patent, Patent and Trademark Office ("PTO") Examiner Nancy Connolly disallowed Claim 20—among others—under Section 103 because it did not meet the "nonobvious" requirement and was therefore unpatentable over the prior art (S.12(M) ¶ 14; S. Ex. 9 at 3–4). Stimsonite responded by explaining that the new invention improved the prior art with "ramp members that are more narrowly spaced apart than in prior art snowplowable markers" (S.12(M) ¶ 17), and more specifically that those ramp members were separated "by substantially about 3.5 inches, which allows a snowplow blade to approach at an angle of incidence of up to 50°" (*id.* ¶ 18). Upon reviewing that distinction, the PTO allowed Claim 20 as originally drafted (*id.* ¶ 19). Once again, Stimsonite placed reliance on the more narrow 3.5 inch distance between the ramps in order to gain a new extended monopoly.

Having distinguished the prior art in order to meet patentability requirements, Stimsonite cannot now broaden its patent claim by arguing that Claim 20 referred to the distance between the ramps at the reflector entrance, or even slightly forward of the reflector entrance. Because Model 96LP (embodying the prior art) itself measures only about 3.75 inches at the reflector entrance,[15] any construction of Claim 20 to refer to the distance between the ramps at the reflector entrance would torpedo it as an advance over that prior art. Stimsonite seeks to urge that one skilled in the art would know that the distance between the ramps at the reflector entrance—not at the distal ends—affects the blade angle that the marker can accommodate, so that such a person would read Claim 20 to refer to the distance at the reflector entrance. But that is an unsupported ipse dixit assertion—to the contrary, S. Mem. 8 argues that its own 96 and 96LP models (which Lowe used as the basis for his 3.75 inch ramp spacing at the

reflector entrance) do not come within the new patent because that narrow reflector entrance measurement does not extend far enough along the ramps to affect the blade angle. That undercuts any contention that it is the distance between the ramps at the reflector entrance that allows for greater blade angles.

Hence when Claim 20 states "said ramp members being separated by a distance of substantially about 3.5 inches from inside to inside," which the specifications contrast to the former 4.9 inch dimension, it must refer either to the distal end of the ramps or, at most, to roughly the last inch of the ramps nearer to the distal end before they go below the road surface. Because the intrinsic evidence unambiguously compels that conclusion, this Court need not turn to extrinsic evidence to construe the claim.

Next, this Court looks to the "whereby" clause in Claim 20—the second half of the element at issue in Claim 20, which indicates that the function of the 3.5 inch distance between the ramps (the first half of the contested element) is to permit a plow blade angle of 50°. Although functional language is of course permissible and "cannot be disregarded" in a patent claim (see *Pac–Tec, Inc. v. Amerace Corp.,* 903 F.2d 796, 801 (Fed.Cir. 1990) [16]), it does not always limit the claim in a substantive way. As *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1172 (Fed.Cir.1993) has put it, citing *Israel v. Cresswell,* 35 C.C.P.A. 890, 166 F.2d 153, 156 (1948):

A "whereby" clause that merely states the result of the limitations in the claim adds nothing to the patentability or substance of the claim.

Just so, the "whereby" clause in Claim 20 simply states the requisite consequence of forming a reflective marker with the dimensions set forth in the '513 Patent claims. It does not set forth an additional limitation. Nonetheless the functional language might still be helpful in interpreting the earlier

---

15. There is no dispute between the parties that 3.75 inches is "substantially about 3.5 inches," which is the magic (and purportedly differentiating) language in Claim 20.

16. As chance would have it, *Pac–Tec* upheld the validity of (and found infringement of) the '945 Patent—Amerace was Stimsonite's predecessor.

element that it modified (that is, the 3.5 inch distance between the ramps). Indeed, the "whereby" clause in Claim 20 enables the reader to determine that the 3.5 inch measurement should be taken where it permits a larger plowblade angle. That interpretive aid, in conjunction with the specification references discussed above, merely further confirms that Claim 20 claims as patentable a 3.5 inch measurement between the ramps not at the reflector entrance, but toward (or at) their distal ends. It does not provide any additional limitation on the claim.

*Literal Infringement*

■ Given the interpretation that this Court has provided for Claim 20, it should be clear that NightLine has not literally infringed the '513 patent. NightLine's B250 and B350 markers do not have ramps that measure "substantially about 3.5 inches" apart in the last inch toward their distal ends.

*Doctrine of Equivalents*

■ Stimsonite also argues that the NightLine markers infringe the '513 Patent under the doctrine of equivalents. That doctrine prevents accused infringers from pirating the essence of a patent by making an insubstantial change to avoid the literal language of a claim (see *Texas Instruments*, 988 F.2d at 1173). However, if too broadly extended the doctrine provides patentees with the opportunity to enlarge their rights beyond the scope of their asserted claims.

In the recent definitive pronouncement on the subject, *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28–30, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (emphasis in original) has both warned against that danger and explained how to avoid it:

> We do, however, share the concern of the dissenters below that the doctrine of equivalents, as it has come to be applied since *Graver Tank* [*& Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) ], has taken on a life of its own, unbounded by the patent claims. There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming require-

ment. Judge Nies identified one means of avoiding this conflict:

> "[A] distinction can be drawn that is not too esoteric between substitution of an equivalent for a component *in* an invention and enlarging the metes and bounds of the invention *beyond* what is claimed.

> \* \* \* \* \* \*

> "Where a claim to an invention is expressed as a combination of elements, as here, 'equivalents' in the sobriquet 'Doctrine of Equivalents' refers to the equivalency of an *element* or *part* of the invention with one that is substituted in the accused product or process.

> \* \* \* \* \* \*

> "This view that the accused device or process must be more than 'equivalent' *overall* reconciles the Supreme Court's position on infringement by equivalents with its concurrent statements that 'the courts have no right to enlarge a patent beyond the scope of its claims as allowed by the Patent Office.' [Citations omitted.] The 'scope' is not enlarged if courts do not go beyond the substitution of equivalent elements." [*Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.,*] 62 F.3d, [1512] at 1573–1574 [Fed. Cir.1995] (dissenting opinion) (emphasis in original).

We concur with this apt reconciliation of our two lines of precedent. Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety. So long as the doctrine of equivalents does not encroach beyond the limits just described, or beyond related limits to be discussed *infra* this page and 31–34, 39, n. 8, and 39–40, we are confident that the doctrine will not vitiate the central functions of the patent claims themselves.

Moving on to frame the doctrine of equivalents test in a manner appropriate for addressing the just-quoted concerns, *Warner–Jenkinson, id.* at 40, 117 S.Ct. 1040 has distilled the various "linguistic frameworks" used by lower courts into a single essential inquiry:

> Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?

To that end (and faithful to *Warner–Jenkinson*) the Federal Circuit has continued to rely on the three-part function-way-result test when appropriate to the particular product at issue, but it has applied that test to the individual elements of the patent, not to the invention as a whole (see, e.g., *Insituform Technologies, Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 692–94 (Fed.Cir.1998)). In this case the critical question may be framed as whether NightLine's substitute element (the widening of the ramps toward their distal ends to something over a 4 inch distance) is "equivalent to" (it certainly is not "identical to") Stimsonite's claimed element (the parallel ramps spaced 3.54 inches apart toward their distal ends). And in those terms Stimsonite has clearly defined its patent claim in such a way that the two elements cannot be considered equivalent.

As interpreted by this Court in the earlier sections of this opinion, Stimsonite's Claim 20 embodies a narrower ramp spacing toward the ends of the ramps than the prior art—3.5 inches rather than 4.9 inches—while explaining that its newer formulation will allow a marker to accommodate a 50° plow blade angle. Having chosen to frame its claim in that fashion (and thus to define what someone may properly do in an effort to engineer around that claim), Stimsonite must be held to its own claim as so defined.

It may well be that NightLine's substitute element can accomplish the same result (of accommodating a greater blade angle) even though it does not share the spacing definition prescribed in Stimsonite's Claim 20. But for Stimsonite to argue that such equiva-lence of *result* is alone enough to bring the doctrine of equivalents into play is to ask this Court to undo both the purpose and the effect of *Warner–Jenkinson* in clarifying and limiting that doctrine.

To put the matter a bit differently, assume that NightLine can succeed in the marketplace with its B250 product—that its markers can indeed accommodate a nearly 50° snowplow blade angle even though their inside-to-inside spacing is *not* "substantially about 3.5 inches" when measured at or very near the. distal ends of the markers. That means that if Stimsonite has indeed discovered (that is, invented) a departure from prior art that qualifies as the proverbial better mousetrap by accomplishing a better result, its definition of that departure in its patent claims has cabined that departure more narrowly than was necessary. But having done so, Stimsonite cannot complain that a competitor that has looked at Stimsonite's statement of its invention and has gone outside of Stimsonite's self-imposed cabining has infringed that invention by such nonequivalent treatment.

It is *not* the function of this Court to determine whether Stimsonite could have defined its claimed invention differently (more broadly) and could still have persuaded the PTO to treat that different and broader claim as patentable over the prior art. Both this Court and any putative competitor such as NightLine—like the PTO itself—are entitled to take Stimsonite at its word in what it did say, not in terms of what it might have said.

In sum, the very factor that has spelled defeat for Stimsonite's charge of direct infringement—the nature of the spacing element of its Claim 20—also serves to sound the death knell for any contention that NightLine's competing product, which does not contain that element *or its equivalent,*[17] runs afoul of the doctrine of equivalents. This Court finds as a matter of law that NightLine also did not infringe the '513 Patent under the doctrine of equivalents.

---

17. By definition, that equivalent would have to be ascertained in terms of its spacing at the same location at which Claim 20 has placed the spac-ing element—at or very near the distal ends of the markers.

### Conclusion

There is no genuine issue of material fact, and NightLine is entitled to a judgment as a matter of law. Because the litigants have agreed that as Claim 20 goes so goes the '513 Patent as a whole, NightLine's motion for declaratory judgment as to noninfringement of the patent is granted, while Stimsonite's cross-motion for summary judgment is of course denied. This action is dismissed with prejudice.[18]

18. It goes pretty much without saying that no law clerk can first begin the exploration of the often arcane mysteries of the patent law canon as "a person skilled in the art" of patent law. All the more credit is therefore due to this Court's highly talented law clerk Lara Flint for her fine work in generating a proposed draft of this opinion, dealing perceptively with the complex issues posed by the parties' dispute. Having said that, this Court hastens to add (as it regularly does in paying tribute to its always outstanding law clerks) that it has painstakingly reworked each sentence and read each case cited in this opinion (and, of course, numerous uncited cases as well), so that the end product is totally this Court's own. If then any errors have found their way into the final version of this opinion, the sole responsibility is this Court's and not that of its law clerk.